The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Pfeiffer and the briefs and oral arguments before the Full Commission. The appealing party has not shown good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the Opinion and Award, except for modifications that do not effect the award.
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing as:
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers Compensation Act.
2. An employment relationship existed between plaintiff and defendant.
3. Defendant is self-insured, with ITT Hartford acting as its third-party administrator.
4. Plaintiffs average weekly wage is determined from an Industrial Commission Form 22 Wage Chart that was provided by defendant at the hearing before the Deputy Commissioner.
5. Plaintiff alleges that she began missing time from work because of an occupational disease on or about 1 June 1998.
6. The issues to be determined by the Commission are whether plaintiff contracted a compensable occupational disease, and, if so, to what medical and indemnity benefits is plaintiff entitled.
7. In addition to the deposition transcripts of the physicians, the parties stipulated into evidence the following exhibits: (1) a packet of fifty-nine pages containing plaintiffs medical records, a job description, plaintiffs personnel file and performance evaluations, the Industrial Commission forms filed, and the parties discovery responses; (2) a videotape of plaintiffs job; (3) the Form 22; and (4) Alan C. Gorrods resume. In addition, defendants exhibit one, an ergonomic job analysis prepared by Mr. Gorrod, was admitted into evidence.
***********
The Full Commission adopts the findings of fact found by the Deputy Commissioner and finds as follows:
 FINDINGS OF FACT
1. On the date of the hearing before the Deputy Commissioner in this matter, plaintiff was forty-four years old and residing in Apex with her husband and two minor children. Plaintiff took one year of accounting classes in France and obtained a nursing degree in France after attending nursing school for two years. Plaintiff worked as a nurse in France for over a year before she moved to the United States in 1981. Upon moving to the United States, plaintiff first worked at a daycare and then was a nursing assistant in a hospital.
2. After staying home for a few years with her children, plaintiff returned to the workforce in 1990 for defendant in Dallas, Texas. Plaintiff was hired as a telemarketing sales representative for defendant and worked in this capacity for about seven months. Plaintiff then became a travel consultant for defendant, a job she held for three years. Plaintiff next worked for American Eagle, where she was a passenger service representative/gate agent for two years. In February 1996 plaintiff began working in reservations sales for defendant after relocating to North Carolina because of her husbands job. As of the date of the hearing before the Deputy Commissioner, plaintiff continued to work on a full-time basis as a reservationist in the promotions department for defendant. Plaintiff works five days a week on shifts eight and a half hours long, which includes a half hour for lunch and two fifteen minute breaks during the day.
3. Her job as a reservationist requires plaintiff to answer incoming telephone calls to assist customers with inquiries and to book reservations for customers. Plaintiff uses a standard personal computer keyboard and also a Qik Res terminal. Qik Res is defendants software system. Reservationists also use a Collins phone pad to receive calls. The job description of a reservationist for defendant indicates that a requirement of the job is to "manipulate three keyboards within established time constraints.
4. When using the Qik Res system, a reservationist uses her thumbs to press the "alt command key and her other fingers to press another key in order to scroll through and get to the functions or screens she needs. The reservationists generally use only one hand when using the Qik Res system. Reservationists have to use their fingers and hands to scroll between functions in the Qik Res system. Reservationists also use their fingers and hands with the other two keyboards to receive an incoming call; search for flight and reservation information; input customer, flight, and reservation information; input credit card numbers for payment of flights; search for and/or input city departure and arrival codes; and for other duties as required when assisting a customer with information or with booking a flight. In fact, the job description of a reservationist specifically requires that employees be able to "handle repetitious tasks with accuracy.
5. From December 1997 through May 1998, plaintiff averaged sixty-one calls per day. Plaintiffs average "talk time per telephone call (the length of time plaintiff spent handling each telephone call) was 286.6 seconds. Between calls, reservationists can press a button making themselves unavailable to receive incoming telephone calls. The average length of this time, called "call work time, in plaintiffs department for the twelve months prior to 1 June 1998 was just sixteen seconds. Defendant strongly encourages employees to keep their call work time near the departmental average, and the amount of call work time of the employees is included as a factor in their performance evaluations. Also included as a factor in the performance evaluations of employees is the amount of time spent by an employee on each call. The employees are encouraged to limit each phone call to less than five minutes.
6. On 1 June 1998 plaintiff began experiencing problems with her hands and arms, particularly to the left arm. On 16 June 1998 plaintiff filled out an injury report and defendant sent her to see Dr. Kinh Tran (no relation to plaintiff). Dr. Tran took a history from plaintiff that included two weeks of progressive pain to plaintiffs left wrist that radiated laterally to her left shoulder, and diagnosed a repetitive strain injury of plaintiffs left wrist. Dr. Tran prescribed ice, a wrist splint, and typing a maximum of two hours at a time with a total of four hours per day. Defendant accommodated plaintiffs restrictions and allowed her to work at her reservationist job in only two-hour increments. On 23 June 1998, plaintiff returned to Dr. Tran, who noted that plaintiff had partial improvement. Dr. Tran continued to prescribe the ice and wrist splint.
7. Defendant denied liability for plaintiffs claim pursuant to a Form 61 that was filed on or about 29 June 1998. The basis for denial was that plaintiff failed to prove her job placed her at an increased risk of developing tendonitis as opposed to members of the general public not so exposed.
8. After seeing Dr. Tran the second time, plaintiff took a previously scheduled two-week vacation. By the time plaintiff returned from her vacation, defendant had denied her claim, and plaintiff was expected to return to her regular job as a reservationist, which she did. However, plaintiffs complaints of pain, swelling, and numbness persisted, and she began to have difficulty sleeping. Due to these continued problems, she sought treatment from her family physician, Dr. Elizabeth Campbell, on 14 July 1998. Dr. Campbell diagnosed left wrist tendonitis, prescribed anti-inflammatory medication, and indicated that plaintiff should continue to wear the splint, at least nocturnally.
9. On 16 July 1998 Dr. Campbell completed a disability form for plaintiff, indicating that for approximately three months plaintiff intermittently needed reduced work hours. Based on this disability form, on 29 July 1998 plaintiff applied for and defendant granted time off work under the Family and Medical Leave Act as indicated by Dr. Campbell. On 31 July 1998, plaintiff returned to Dr. Campbell, who referred plaintiff to Dr. Stephen Gupton, a neurologist.
10. Plaintiff began treating with Dr. Gupton on 5 August 1998. Dr. Gupton ordered nerve conduction studies, which were completed on 12 August 1998. These tests were normal. Dr. Gupton prescribed a Medrol Dosepak, which gave plaintiff temporary improvement of her symptoms during the period of time she used the Medrol. Plaintiffs symptoms of pain, numbness, and wakefulness at night returned after this course of treatment was completed. Accordingly, on 3 September 1998 Dr. Gupton extended plaintiffs intermittent family leave for another three to four months. When plaintiff saw Dr. Gupton on 16 November 1998, he indicated that plaintiffs hand symptoms were aggravated by her work and also by her activities at home. A subsequent cervical MRI revealed nothing abnormal, and on 23 November 1998 Dr. Gupton told plaintiff she could continue her activities. On 17 December 1998 Dr. Gupton felt that plaintiff could continue to work but she still occasionally needed to leave work early.
11. Plaintiff was sent to Dr. Edwards, an orthopedic surgeon who specializes in the diagnosis and treatment of upper extremities, on 2 December 1998. At this evaluation Dr. Edwards diagnosed bilateral forearm tendonitis and bilateral deQuervains tenosynovitis. Based upon plaintiffs description of her job, Dr. Edwards felt that the reservationist position aggravated or contributed to the development of her tendonitis symptoms. However, after viewing a videotape, Dr. Edwards stated that the reservationist job, if it is performed as depicted in the videotape, would not have caused or significantly contributed to plaintiffs hand problems. However, Dr. Edwards later qualified this opinion by stating that the position could predispose plaintiff to developing hand problems if the job required keyboard work for prolonged periods of time and with the rate of sixty keystrokes per minute.
12. Defendant employed an ergonomic specialist, Alan Gorrod, to perform an ergonomic analysis of the reservationist position. This specialist concluded that the position placed its employees at a moderate risk of repetitive motion. Mr. Gorrods analysis placed heavy emphasis on the fact that typing is not performed on a constant basis such as in a transcriptionist job. However, the typing and keying required of a reservationist is quite frequent.
13. Based upon his review of plaintiffs symptoms, the history given by plaintiff, and plaintiffs job description, Dr. Gupton stated that plaintiffs job as a reservationist for defendant probably caused her to develop tenosynovitis. Dr. Campbell also agreed that plaintiffs job as a reservationist caused her to develop tenosynovitis.
14. Because Drs. Gupton and Campbell have been plaintiffs treating physicians while Dr. Edwards only saw plaintiff on an independent medical evaluation basis, the opinions expressed by Drs. Gupton and Campbell are afforded greater weight than those expressed by Dr. Edwards. Furthermore, the opinions of the ergonomist specialist, who is not a medical expert, are not afforded significant weight, as his analysis seems to center on a comparison between a reservationist and a transcriptionist as opposed to comparing a reservationist to members of the general public. According to the greater weight of the evidence presented, therefore, plaintiffs frequent use of her hands and arms in her position as a reservationist for defendant caused her to develop or significantly contributed to her development of tenosynovitis.
***********
Based on the findings of fact and conclusions of law, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. Plaintiffs average weekly wage on or about 1 June 1998 was $353.36. N.C. Gen. Stat. 97-2(5).
2. Plaintiffs tenosynovitis was caused by the cumulative trauma plaintiff experienced in her job as a reservationist for defendant. N.C. Gen. Stat. 97-53(21).
3. Plaintiff contracted a compensable occupational disease, tenosynovitis, due to cumulative trauma experienced during her job as a reservationist for defendant, and, as a result, plaintiffs disability began on 16 June 1998, when she was first assigned medical restrictions and was unable to perform her regular work. N.C. Gen. Stat. 97-53(21);97-54.
4. As a result of her compensable occupational disease, plaintiff is entitled to temporary partial disability benefits at a rate of two-thirds of the difference between her average weekly wage before her disability, $353.36, and the average weekly wages she earned after 16 June 1998. This compensation is payable to plaintiff for a period of time no longer than 300 weeks following her contraction of the occupational disease. N.C. Gen. Stat. 97-30.
5. Plaintiff is entitled to have defendant provide all medical treatment for her compensable occupational disease, so long as the treatment is or was reasonably necessary to effect a cure, give relief, or lessen the period of plaintiffs disability. N.C. Gen. Stat. 97-2(19);97-59.
***********
Based on the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendant shall pay to plaintiff temporary partial disability benefits at a rate of two-thirds of the difference between her average weekly wage before her disability, $353.36, and the average weekly wages she earned after 16 June 1998. This compensation is payable to plaintiff for a period of time no longer than 300 weeks following her contraction of the occupational disease. Said compensation that has accrued shall be paid in a lump sum, and is subject to the attorneys fee awarded below.
2. Defendant shall provide for all medical compensation that plaintiff has received or will receive that was and is reasonably necessary to effect a cure, give relief, or lessen the period of plaintiffs disability. Plaintiffs entitlement to ongoing medical benefits is limited to two years after defendants last payment to her of indemnity or medical benefits.
3. A reasonable attorneys fee of twenty-five percent of the compensation due plaintiff under this AWARD is approved for plaintiffs counsel and shall be paid as follows: twenty-five percent of the accrued benefits shall be deducted from that sum and paid directly to plaintiffs counsel. Thereafter, every fourth compensation check shall be deducted from the sum due plaintiff and paid directly to plaintiffs counsel.
4. Defendant shall bear the costs of this appeal.
This is the ___ day of September, 2000.
S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
S/_____________ THOMAS J. BOLCH COMMISSIONER
S/________________ RENÉE C. RIGGSBEE COMMISSIONER